IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

|  |  |
|---|---|
| KENNETH D. BELL, in his capacity as court-appointed Receiver for Rex Venture Group, LLC d/b/a ZeekRewards.com, <br><br> Plaintiff, <br><br> vs. <br><br> HOWARD N. KAPLAN, <br><br> Defendant. | Civil Action No. 3:14-cv-352 |

## COMPLAINT

Kenneth D. Bell (the "Receiver"), as Receiver for Rex Venture Group, LLC ("RVG") d/b/a www.ZeekRewards.com ("ZeekRewards" or "Zeek"), alleges as follows:

## SUMMARY OF CLAIMS

1. From January 2011 until August 2012, RVG operated a massive Ponzi and pyramid scheme through ZeekRewards, an internet based so-called "MLM" (multi-level marketing) program. Howard N. Kaplan served as legal counsel to RVG from around January 2012 until August 2012, when RVG was placed into receivership. This lawsuit is one of several steps the Receiver is taking pursuant to his court-ordered duties to the Receivership Estate to recover damages for the harms incurred by RVG.

2. By virtue of his knowledge of RVG and ZeekRewards and his legal expertise, Kaplan knew or should have known that RVG was perpetrating an unlawful

scheme which involved a pyramid scheme, an unregistered investment contract and/or a Ponzi scheme. Despite this knowledge, Kaplan actively encouraged investors to participate in the scheme by promoting ZeekRewards through providing tax advice to current and prospective investors in the program and knowingly allowed his name to be used to promote the scheme. Kaplan's improper and negligent actions, which breached his fiduciary duties to RVG and assisted RVG's Insiders to breach their fiduciary duties, caused significant damage to RVG. As described in detail below, Kaplan is liable to RVG for those damages.

## THE PARTIES

### The Receiver

3. Kenneth D. Bell is the Receiver appointed by this Court in *Securities and Exchange Commission v. Rex Venture Group, LLC d/b/a ZeekRewards.com and Paul Burks*, Civil Action No. 3:12-cv-519 (the "SEC Action") for and over the assets, rights, and all other interests of the estate of Rex Venture Group, LLC, d/b/a ZeekRewards.com and its subsidiaries and any businesses or business names under which it does business (the "Receivership Entities"). For jurisdictional purposes, Plaintiff is a citizen of the State of North Carolina.

### The Receivership Entity

4. The primary Receivership Entity, Rex Venture Group, LLC is a Nevada limited liability company with its former principal place of business in Lexington, North Carolina. RVG wholly owns and operated ZeekRewards, an internet website (www.zeekrewards.com) with a physical location for operations in Lexington, North

2

Carolina, and internet customers and contacts in this judicial district and throughout the United States and internationally. RVG also owned and operated Zeekler.com, an online auction business.

### **The Defendant**

5. Howard N. Kaplan is upon information and belief a Nebraska resident who practices law as The Law Offices of Howard N. Kaplan in Omaha, Nebraska. Upon information and belief, The Law Offices of Howard N. Kaplan is a sole proprietorship. Kaplan served as counsel to RVG from January 2012 until at least August 15, 2012.

### **JURISDICTION, VENUE AND STANDING**

6. On August 17, 2012, the Securities and Exchange Commission filed the SEC Action in this District pursuant to Sections 20(b), 20(d)(1) and/or 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a)] and Sections 21(d)(1), 21(d)(3)(A), 21(e) and/or 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d)(l), 78u(d)(3)(A), 78u(e) & 78aa] to halt the ZeekRewards Ponzi and pyramid scheme, freeze RVG's assets, and seek the appointment of a receiver for RVG.

7. On the same date, in an Agreed Order Appointing Temporary Receiver and Freezing Assets of Defendant Rex Venture Group, LLC (the "Agreed Order"), this Court authorized and directed Mr. Bell as RVG's Receiver to institute actions and legal proceedings seeking the avoidance of fraudulent transfers, disgorgement of profits, imposition of constructive trusts and any other legal and equitable relief that the Receiver

3

Case 3:14-cv-00352-GCM   Document 1   Filed 06/25/14   Page 3 of 17

deems necessary and appropriate to preserve and recover RVG's assets for the benefit of the Receivership Estate.

8. Within 10 days of his reappointment on December 4, 2012, the Receiver filed the original Complaint and Agreed Order in the SEC Action in all of the United States District Courts pursuant to 28 U.S.C. § 754 giving this Court jurisdiction over RVG's property in every federal district.

9. As an action brought by the Receiver in furtherance of his appointment and in the performance of his duties as directed by this Court, this action is within the ancillary jurisdiction of this Court.

10. This Court also has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because Plaintiff and Defendant are citizens of different states and the amount in controversy exceeds $75,000, excluding interest and costs.

11. This action is also within the ancillary jurisdiction of this Court because this action concerns RVG's property and assets, which are now under this Court's exclusive jurisdiction.

12. This Court has subject matter jurisdiction over this matter pursuant to its common law ancillary jurisdiction as set forth above.

13. Also, this Court has subject matter jurisdiction under 28 U.S.C. § 1367 because this action is directly related to the claims in the SEC Action, concerns property within this Court's exclusive control and/or is in furtherance of the duties given to the Receiver by this Court.

14. This Court has personal jurisdiction over the Defendant pursuant to 28 U.S.C. § 754 and 28 U.S.C. § 1692.

15. This Court also has personal jurisdiction over the Defendant pursuant to N.C. Gen. Stat. §1-75.4 because, *inter alia*, the Defendant provided legal services to RVG, which operated in North Carolina, and he received payments from RVG through its banks located in North Carolina. By voluntarily assisting the operation of the ZeekRewards scheme, including numerous communications with RVG and/or meetings in North Carolina, the Defendant created a substantial connection to North Carolina such that the exercise of personal jurisdiction over him is fair and just.

16. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial portion of the acts and transfers alleged herein, as well as the harm sustained because of Defendant's actions and omissions, occurred in this District. Defendant provided legal services to RVG in North Carolina, and these services directed at North Carolina gave rise to the causes of action asserted below.

17. The Receiver has standing to bring the claims made in this action pursuant to his authority and the direction of this Court.

18. Pursuant to the Agreed Order, the Receiver has obtained the permission of this Court to file this action.

## FACTUAL BACKGROUND

*The ZeekRewards Scheme[1]*

19. Beginning at least as far back as 1997, Paul Burks, RVG's owner and lead executive, operated a number of generally unsuccessful multi-level marketing businesses through Rex Venture Group, LLC (and related entities).

20. Dawn Wright-Olivares was RVG's Chief Operating Officer and the Chief Marketing Officer of ZeekRewards. Together with Burks, Wright-Olivares developed the ZeekRewards scheme.

21. Other key employees of RVG included Daniel ("Danny") Olivares, Wright-Olivares' stepson who was responsible for designing and running RVG's websites and databases with Burks; Alexandre ("Alex") de Brantes, Wright-Olivares' then-fiancée who had the title of Executive Director of Training and Support Services; Roger Plyler, who handled "affiliate relations"; and Darryle Douglas, who was a member of RVG's senior-level management. Collectively, these individuals may be referred to as RVG's "Insiders."

22. In 2010, RVG launched Zeekler.com, a so-called "penny auction" website where items ranging from personal electronics to cash were auctioned to bidders.

---

[1] A more detailed description of the operation of the ZeekRewards scheme is contained in paragraphs 36-134 of the Complaint against RVG's Insiders filed in *See Bell v. Burks et al*, No. 3:14-cv-89 (W.D.N.C. filed Feb. 28, 2014), which is attached as Exhibit 1. The allegations of those paragraphs are hereby incorporated by reference and alleged in this complaint.

23. A "penny auction" does not work like a typical auction. In a normal auction, it costs nothing to bid, and the auction price rises based on the amount of the bid until there is no higher bid or the amount of time set for the auction expires. In a "penny auction," bids must be *purchased* by bidders, and each incremental bid placed raises the amount of the total price of the auction item only by $0.01. The winner pays the final auction price (plus the cost of bids used), which is theoretically well below the retail price. However, the unsuccessful bidders lose all the money they spent to purchase bids.

24. During 2010, the Zeekler penny auctions were not very successful, but RVG's fortunes changed in 2011. In January 2011, RVG launched a new money-making scheme – ZeekRewards. RVG promoted ZeekRewards as Zeekler.com's "private, invitation-only affiliate advertising division." In reality, ZeekRewards was just a multi-level marketing scheme grafted onto the Zeekler business. It falsely purported to pay a portion of the profits from the Zeekler penny auction business to participants who earned bid balances or points, primarily by buying auction bids. Also, participants in ZeekRewards, often called "Affiliates," were paid for recruiting other participants in a pyramid "multi-level" sales format.

25. The financial essence of the scheme – to buy bids to get a profit share and get paid for recruiting others to the scheme – was clear to many affiliates and was or should have been clear to Kaplan. From the beginning, RVG intended to use "bids" in ZeekRewards not as a product but as a proxy for money deposited into the program. Dawn Wright-Olivares was very clear about the plan, telling Danny Olivares on January

7

21, 2011: "We're just going to use bids as currency." On another occasion, Dawn Wright-Olivares referred to the compounding bids as "Monopoly money."

26. ZeekRewards emphasized that the offer to pay Affiliates for purchasing compounding / sample / VIP "bids" distinguished those bids from the simple purchase of retail bids to participate in the Zeekler auctions. In the "About us" section of the ZeekRewards website, the company wrote: "PLEASE NOTE: To qualify for the 125% reward points you MUST buy the bids in the ZeekRewards back office. Bids purchased on the Zeekler Penny Auction site are 'retail customer' bids and do not qualify."

27. Further, ZeekRewards made clear that even though bids bought through ZeekRewards could be used in the auctions, that fact was irrelevant to the multi-level marketing scheme. Affiliates were told that using the bids in the auction would have no effect on their all-important bid or points balance ("Each time you buy a Compounding Bid in your ZeekRewards Back Office a bid is added to the Compounding bucket. *Spending the bid in an auction does not remove it from the bucket*.") (emphasis added).

28. As one Affiliate told Burks, "I know how the system works mathematically and you know I know. Whether you call the bids bids or hamburgers makes no difference. People are not joining Zeek to get hamburgers, or auction bids; they are joining Zeek to make money…."

29. Not surprisingly, relatively few ZeekRewards non-retail bids were used in the Zeekler auctions. Prior to shutdown, RVG estimated that only approximately 19 million VIP bids were used in auctions out of over 7 billion VIP bids sold to Affiliates – less than 1/3 of 1%.

8

30. The ZeekRewards scheme, rather than the penny auction site, was the source of nearly all the company's income. Relative to ZeekRewards, little or no money was made in the Zeekler "penny auction" business. According to the ZeekRewards database, ZeekRewards sold approximately $820 million in compounding / sample / VIP bids, but only about $10 million in retail bids were sold.

31. Kaplan knew or should have known that insufficient income from the penny auction business was being made to pay the daily "profit share" promised by ZeekRewards. Kaplan knew or should have known that the money used to fund ZeekRewards' distributions to Affiliates came almost entirely from new participants rather than income from the Zeekler penny auctions.

32. Further, Kaplan knew or should have known that the alleged "profit percentage" was nothing more than a number made up by Burks or one of the other Insiders. Rather than reflecting the typical variances that might be expected in a company's profits, the alleged profits paid in ZeekRewards were remarkably consistent, falling nearly always between 1% and 2% on Monday through Thursday and between .5% and 1% on the weekends, Friday through Sunday.

33. With RVG's and Kaplan' knowledge, Affiliates regularly and openly touted the consistent payments in their recruiting of new participants. For example, one leading Affiliate's email footer said: "It has been going like clockwork for over 220 days, 7 days per week.".... "EVERYONE. . .GETS. . .PAID. . .FIRST. . .DAY!" . . . This works every time with just one minute per day! If you're not getting paid every single day for 1

9

minute of work, . . . [sic] why not?" . . . "100 percent of our active members are paid daily 100 percent of the time within their first 24 hours without any referrals."

34. This fake consistency should have, at a minimum, caused reasonably diligent legal counsel to inquire further about the validity of the alleged profits. Indeed, the program publicly advertised historical average returns of 1.4% per day, which no legitimate investment could accomplish. But, Kaplan deliberately turned a blind eye to these incredible claims and chose not to seek further information.

35. It was or should have been obvious to Kaplan that ZeekRewards succeeded because it promoted this lucrative "compensation plan," offering large amounts of passive income to entice individuals to participate in the scheme. Kaplan knew that participants in the ZeekRewards scheme invested money in the scheme expecting that they would receive profits from the Zeekler penny auction or other Zeek efforts. Thus, Kaplan knew or should have known that RVG, with his assistance, was promoting an unlawful unregistered security.

36. Finally, Kaplan knew or should have known that the ZeekRewards compensation plan was paying Affiliates to recruit other Affiliates in an unlawful pyramid-style payment system. ZeekRewards openly referred to this system as the "Matrix."

37. The Matrix pyramid was initially a "2x21" matrix in which Affiliates made multi-level marketing commissions for 21 levels down in their "organization." Later, ZeekRewards used a "2x5 forced-fill matrix," which is a pyramid with 63 positions that paid a bonus to Affiliates for every "downline" investor within each affiliate's first five

10

levels, plus a "matching bonus" for every subsequent 5th level where certain qualifiers were met; so in effect, the commissions could be earned indefinitely.

38. To get bonuses through the Matrix, Affiliates just had to (1) enroll in a monthly subscription plan requiring payments of $10, $50, or $99 per month; and (2) recruit at least two other "Preferred Customers" (i.e., investors who also enrolled in a monthly subscription plan). Once qualified, Affiliates earned bonuses and commissions for every paid subscription within their "downline" pyramid, whether or not they personally recruited everyone within the matrix.

39. Simply put, Kaplan knew or should have known that affiliates were rewarded merely for recruiting new investors without regard to any efforts by the Affiliates to sell bids or products or otherwise materially support the Zeekler retail business.

*Kaplan Played an Integral Role*

40. Kaplan played an indispensable role in the scheme. Because of the lucrative, seemingly "too good to be true" claims being made by RVG and ZeekRewards, many potential investors were skeptical of whether the scheme was legal and legitimate. So, RVG enlisted the aid of Kaplan and other legal counsel to assist in promoting and legitimizing the scheme.

41. Kaplan helped in several ways. Very early in his representation of RVG, Kaplan knew or should have known that ZeekRewards was an unlawful program. He was aware that the program advertised historical average returns of 1.4% per day, which

11

no legitimate investment could accomplish. Nonetheless, Kaplan appeared on two Affiliate "Leadership Calls" with Dawn Wright-Olivares to promote ZeekRewards.

42. In addition, he provided a "frequently asked questions" document ("FAQ") for use on ZeekRewards' website and made himself available to affiliates for follow-up tax questions via email.

43. Wright-Olivares had told him early in his representation of RVG that the compensation plan faced potential securities issues. In fact, Kaplan's understanding of the ZeekRewards compensation plan was such that in describing it he found it difficult to characterize it as anything other than an investment. In a February 2012 email to Wright-Olivares, Kaplan wrote:

> I concur that because of the way your plan is structured, there is constructive receipt [of affiliate income] because of the choice your affiliates have. Perhaps it can be compared to dividend reinvestment, where one chooses to buy more stock rather than cash out the dividends.

44. And Kaplan quickly came to understand that Wright-Olivares prohibited the characterization of Zeek as an "investment," since that word raised securities and SEC implications. As a result, Kaplan refrained from mentioning on the leadership calls or in his FAQ the tax implications that would arise if Affiliate payments were treated by the IRS as an "investment."

45. Instead of properly informing Affiliates of the different tax implications they would face if their Zeek payments were properly characterized as coming from an "investment" rather than a "trade or business," Kaplan failed to inform Affiliates, either

on the calls or in his FAQs, of the material fact that payments to Affiliates should be characterized as investment income for tax reporting purposes.

46. For example, in the FAQs that he drafted and allowed ZeekRewards to post to its website, Kaplan advised that Affiliates should use IRS Schedule C ("Profit or Loss from Business") to record their income, making no mention of the fact that they should use IRS Schedule D ("Capital Gains and Losses").

47. If Kaplan had candidly disclosed the material fact that Affiliate income would be properly characterized by the IRS as capital gains, the obvious negative tax implications would have caused many Zeek Affiliates to remove their cash earnings from the program rather than reinvesting them, short-circuiting the scheme much earlier. Since he did not, Affiliates were placated in their misguided belief that ZeekRewards was a lawful program.

48. Moreover, by allowing ZeekRewards to use his name in providing Affiliates the false perception that ZeekRewards was a lawful enterprise and by serving as a resource in answering Affiliates' tax questions via email, Kaplan assisted in prolonging the scheme, deepening RVG's insolvency and causing significantly more loss to RVG than it otherwise would have incurred.

## FIRST CLAIM FOR RELIEF
**Legal Malpractice / Negligence / Breach of Fiduciary Duty**

49. The Receiver realleges and incorporates by reference the foregoing paragraphs.

50. As RVG's attorney, Defendant owed a fiduciary duty to RVG that required

Defendant to exercise the degree of care, skill, or diligence that an attorney of ordinary skill and knowledge commonly possesses.

51. Defendant's negligent acts and omissions, including generally promoting the scheme, failing to provide material facts (including tax information) during ZeekRewards promotional calls, and allowing his name to be used to prop up ZeekRewards as a supposedly legitimate enterprise, breached his duties to RVG.

52. Defendant's negligence and breach of these duties proximately caused an injury to RVG in an amount in excess of $100 million.

53. As a result of Defendant's breach, RVG is entitled to recover its damages from the Defendant.

## SECOND CLAIM FOR RELIEF
### Aiding and Abetting Breach of Fiduciary Duty

54. The Receiver realleges and incorporates by reference the foregoing paragraphs.

55. Burks and the other RVG Insiders owed fiduciary duties to RVG.

56. These Insiders failed to act in good faith and with due regard to RVG's interests when they knowingly operated an unlawful compensation plan and caused hundreds of millions of dollars of damages to RVG.

57. Defendant had knowledge of the Insiders' breaches of their fiduciary duties to RVG.

58. Defendant, knowing that his conduct alleged herein – including generally promoting the scheme, failing to provide material facts during ZeekRewards promotional

14

calls, and allowing his name to be used to prop up ZeekRewards as a supposedly legitimate enterprise – served to aid or abet the Insiders' breaches, substantially assisted the Insiders in their breaches of fiduciary duty.

59. Defendant knew or should have known that his aiding, abetting, or participation in these breaches of fiduciary duties would result in significant harm to RVG.

60. These breaches of the fiduciary relationship and Defendant's substantial assistance in the breaches have directly and proximately caused substantial harm to RVG, including, but not limited to, the financial claims of the victims of the Zeek Ponzi and/or pyramid scheme against RVG.

61. RVG is entitled to recover from the Defendant the amount of damages proximately caused by his conduct in an amount to be proven at trial.

62. The Defendant's substantial assistance to these breaches of fiduciary duties was willful, wanton, and outrageous, and RVG is entitled to an award of punitive damages against the Defendant to deter such conduct in the future.

### THIRD CLAIM FOR RELIEF
#### Constructive Trust

63. The Receiver realleges and incorporates by reference the foregoing paragraphs.

64. As alleged above, the assets of the Receivership Entities have been wrongfully diverted as a result of breaches of fiduciary duty and other wrongful conduct for the Defendant's individual interests and enrichment.

65. The Receiver has no adequate remedy at law.

66. Because of this conduct, the Receiver is entitled to the imposition of a constructive trust with respect to any transfer of funds, assets, or property from the Receivership Entities, as well as any assets received by Defendant in the past or on a going forward basis as a result of those transfers from the Receivership Entities.

67. The Receiver is entitled to and demands title, possession, use and enjoyment of the foregoing property for the benefit of the Receivership Estate.

## **PRAYER FOR RELIEF**

WHEREFORE, the Receiver respectfully requests that the Court:

1. Enter Judgment against the Defendant for the losses suffered by RVG in an amount to be determined at trial.

2. Award the Receiver just and reasonable attorney fees, subject to Court approval, which are justified in light of the costs to the Receivership Estate in bringing this action.

3. Award prejudgment and post-judgment interest, costs and such other and further relief as the Receiver is entitled to recover.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

Dated:  June 25, 2014                               Respectfully submitted,


/s/ Irving M. Brenner
Kenneth D. Bell, Esq., Receiver
Irving M. Brenner (NC Bar No. 15483)
Matthew E. Orso (NC Bar No. 42409)
Susan C. Rodriguez (NC Bar No. 40035)
McGuireWoods LLP
201 North Tryon Street, Suite 3000
Charlotte, North Carolina 28202
(704) 343-2000
(704) 373-8836 (fax)
kbell@mcguirewoods.com
ibrenner@mcguirewoods.com
morso@mcguirewoods.com
srodriguez@mcguirewoods.com