IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:14CV352

KENNETH D. BELL, in his capacity as a )
court-appointed Receiver for Rex Venture Group, )
LLC d/b/a ZeekRewards.com, )
 )
    Plaintiff, )
 )
v. )
 ) ORDER
 )
HOWARD N. KAPLAN, )
 )
    Defendant. )
                                             )

This matter is before the Court upon Defendant Howard N. Kaplan's Motion to Dismiss. (Doc. No. 9). For the reasons stated herein, the motion is granted in part and denied in part.

## I.    FACTUAL BACKGROUND

This "clawback" litigation was initiated by the Receiver of Rex Venture Group, LLC ("RVG"). The Complaint alleges as follows: Paul Burks, the owner and former top executive of RVG, and other management insiders used RVG in their operation of a massive Ponzi and pyramid scheme through ZeekRewards from at least January 2011 until August 2012. (Compl. at 6 n. 1) (incorporating by reference the Complaint in *Bell v. Burks, et al.*, No. 3:14CV89 (W.D.N.C. filed February 28, 2014)). On August 17, 2012, the Securities and Exchange Commission filed an action in this Court, *Securities and Exchange Commission v. Rex Venture Group, LLC d/b/a ZeekRewards.com and Paul Burks*, Civil Action No. 3:12-cv-519 (the "SEC Action"), to obtain injunctive and monetary relief against Paul Burks, shut down the

1

ZeekRewards Ponzi and pyramid scheme, freeze RVG's assets, and seek appointment of a Receiver for RVG. (Compl. at ¶ 6).

That same date, in an Agreed Order Appointing Temporary Receiver and Freezing Assets of Defendant Rex Venture Group, LLC (the "Agreed Order"), this Court appointed Kenneth D. Bell as the Receiver over the assets, rights, and all other interests of the estate of Rex Venture Group, LLC, d/b/a www.ZeekRewards.com and its subsidiaries and any businesses or business names under which it does business (the "Receivership Entities"). (*Id.* at ¶ 7). The Order further directed Mr. Bell as RVG's Receiver to institute actions and legal proceedings seeking the avoidance of fraudulent transfers, disgorgement of profits, imposition of constructive trusts and any other legal and equitable relief that the Receiver deems necessary and appropriate to preserve and recover RVG's assets for the benefit of the Receivership Estate. (*Id.*)

Howard Kaplan ("Kaplan") served as legal counsel to RVG from roughly January 2012 until August 2012, when RVG was placed into receivership. (*Id.* at ¶ 1). The financial essence of the ZeekRewards scheme – to buy bids to receive a profit share and get paid for recruiting others to the scheme – was or should have been clear to Kaplan. (*Id.* at ¶ 25). Kaplan knew that participants in the ZeekRewards scheme invested money in the scheme expecting that they would receive profits from the Zeekler penny auction or other ZeekRewards efforts. (*Id.* at ¶ 35). Despite his knowledge of the scheme and that ZeekRewards' compensation plan faced potential security issues, Kaplan misled affiliates into believing that they need not report their ZeekRewards income as investment income, giving them a false impression that ZeekRewards was a legitimate enterprise and prolonging the life of the scheme. (*Id.* at ¶¶ 43-47). Moreover, Kaplan deliberately turned a blind eye to ZeekRewards's implausible income claims, including average returns of 1.4% per day. (*Id.* at ¶ 34).

With all this significant information indicating that he was representing an unlawful scheme, Kaplan nonetheless assisted the Insiders in promoting and legitimizing the public perception of this scheme. (*Id.* at ¶¶ 35, 40). Kaplan appeared on at least two Affiliate "Leadership Calls" with Dawn Wright-Olivares to promote ZeekRewards. (*Id.* at ¶ 41). He provided a "frequently asked questions" document ("FAQ") for use on ZeekRewards' website and made himself available to affiliates for follow-up tax questions via email. (*Id*. at ¶ 42). In addition, Kaplan allowed ZeekRewards to use his name in promoting the scheme, deepening RVG's insolvency and causing significantly more loss to RVG than it otherwise would have incurred, including the financial claims of the victims of the ZeekRewards Ponzi and/or pyramid scheme against RVG. (*Id.* at ¶¶ 48, 60).

The Receiver filed this action against Kaplan on June 25, 2014. The Complaint alleges claims for legal malpractice/negligence/breach of fiduciary duty (Claim I), aiding and abetting breach of fiduciary duty (Claim II), and Constructive Trust (Claim III). Kaplan moves to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

**II. DISCUSSION**

**A. Standard of Review**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more

than a sheer possibility" that the defendant is liable for the alleged harm. *Id*. (quoting *Twombly*, 550 U.S. at 556).

**B. *In Pari Delicto* Defense**

Kaplan's primary argument in support of his motion to dismiss is based upon the doctrine of *in pari delicto*. *In pari delicto* is an equitable common law defense and stands for the idea that when two parties are in equal fault, the plaintiff's wrongdoing is a full bar to recovery. However, there are important "limitations and exceptions" to the doctrine, including the specific requirement that "public policy implications" be considered. *See Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) ("the classic formulation of the *in pari delicto* doctrine itself require[s] a careful consideration of such [public policy] implications before allowing the defense."); *Jones v. Wells Fargo Bank, N.A.*, 666 F.3d 955, 966–67 (5th Cir. 2012) ("the *in pari delicto* doctrine is not for the benefit of either party and not to punish either of them, but for the benefit of the public" and "application of the doctrine depends upon the peculiar facts and equities of the case, and the answer usually given is that which is thought would better serve public policy.") In *Bateman*, the Supreme Court considered such public policy implications in refusing to apply the *in pari delicto* defense to an action under the federal securities laws between a "tipper" and a "tippee" in which the "tipper" sought to avoid claims by the "tippee" based on the "tippee's" unlawful use of the inside information provided by the defendant. Indeed, the court held that the "tippee's" private action for damages could only be barred if (in addition to other requirements) "preclusion of suit would not significantly interfere with the effective enforcement of the securities laws and protection of the investing public." *Id.* at 310-11. Moreover, the North Carolina Supreme Court has recognized that "[e]ven where the

4

contracting parties are *in pari delicto*, the courts may interfere from motives of public policy.*"* *Cauble v. Trexler*, 227 N.C. 307, 312 (1947).

The application of the *in pari delicto* defense becomes more complex where, as here, a receiver stands in the shoes of the wrongdoer. While neither North Carolina courts nor the Fourth Circuit have considered its application in such a case, the Seventh Circuit declined to apply the doctrine to a receivership in *Scholes v. Lehman*, 56 F.3d 750 (7th Cir. 1995). *Scholes* was a Ponzi scheme case and the receiver sued certain outsiders with fraudulent conveyance claims. The court allowed the claims to proceed despite the *in pari delicto* defense, reasoning that the receivership entities were not the wrongdoers, but the controlling principal. Once the receiver was appointed and the wrongdoer was removed, the corporate entities were entitled to a return of the money fraudulently transferred. This Court has relied upon *Scholes* in *Quilling v. Cristell*, 2006 U.S. Dist. LEXIS 8480 (W.D.N.C., Feb. 9, 2006), deciding that a receiver had standing to pursue a fraudulent conveyance claim in view of an *in pari delicto* defense.

Kaplan relies upon a subsequent Seventh Circuit case to support application of the doctrine to the claims herein. In *Knauer v. Jonathon Roberts Fin. Group, Inc*., 348 F.3d 230 (7th Cir. 2003), the receiver of two entities used to conduct a Ponzi scheme sued two broker dealer entities. Fraudulent transfers were not at issue, rather defendants were accused of being active in the scheme by failing to properly supervise or maintain proper control of the individual employees who perpetrated the scheme. The broker dealers moved to dismiss on the grounds of *in pari delicto*. The Seventh Circuit affirmed dismissal under the doctrine, discussing *Scholes*, but reasoning as follows:

> The key difference, for purposes of equity, between fraudulent conveyance cases such as *Scholes* and the instant case is the identities of the defendants. The receiver here is not seeking to recover the diverted funds from the beneficiaries of the diversions (e.g., the recipients of Douglas's transfers in

5

> *Scholes*). Rather, this is a claim for tort damages from entities that derived no benefit from embezzlements, but that were allegedly partly to blame for their occurrence. In the equitable balancing before us, we find *Scholes* less pertinent than the general Indiana rule that the receiver stands precisely in the shoes of the corporations for which he has been appointed.

*Knauer,* 348 F. 3d at 236.

Kaplan argues that like the defendants in *Knauer*, he received no fraudulently transferred funds from Rex, and should thus be allowed to assert the *in pari delicto* defense.

Kaplan also relies on two South Carolina cases, one state and one federal. In *Myatt v. RHBT Fin. Corp.*, 635 S.E.2d 545 (S.C. Ct. App. 2006), the receiver for corporations used to conduct fraudulent investment schemes sued the bank that facilitated the transactions for tort damages. As in *Knauer*, no diverted funds were sought from the bank. Following *Knauer*, the South Carolina Court of Appeals held that "in the absence of a fraudulent conveyance case, the receiver of a corporation used to perpetrate fraud may not seek recovery against an alleged third-party co-conspirator in the fraud." *Myatt*, 635 S.E.2d at 548.

In *Hays v. Pearlman*, 2010 WL 4510956 (D.S.C. Nov. 2. 2010), the receiver sued the attorney who helped create the corporate entities used to perpetrate a Ponzi scheme. The receiver alleged claims of malpractice and breach of fiduciary duty and the defendant argued that the claims should be dismissed under the doctrine of *in pari delicto*. In an unpublished decision, Judge David Norton, relying on *Myatt* and *Knauer*, and barred the claims, stating "[t]he instant case is in line with *Knauer*. Plaintiff receiver seeks tort damages from defendant Pearlman who derived no alleged

benefit from Parish's Ponzi scheme; however, he is alleged to have been partly to blame for the occurrence of the Ponzi scheme." *Id*. at * 7.

While this Court has great respect for Judge Norton, the Court finds that the application of the doctrine of *in pari delicto* in this particular case would result in a great inequity. Judge Norton's decision, as well as the *Myatt* case, rely heavily on *Knauer*. While the *Knauer* court distinguished the case where a receiver is seeking to recover a fraudulent conveyance from the defendant, the court failed to explain why that distinction would make any difference in the equities because the money recovered in both circumstances would go to the victims who were defrauded. Instead, the real basis of the court's equitable balancing can be found in its description of the claims against the broker dealer defendants: "[i]n sum, all of the liability, according to the complaint, arises from the employment or agency relationship between the broker dealer defendants and [the wrongdoers]." *Knauer*, 348 F.3d at 237. That is, the claims against the broker dealers were primarily passive and derivative of the wrongdoing of the perpetrators of the scheme. Indeed, the court emphasized that, "there is no allegation whatsoever that the defendants were directly involved in the embezzlement …" (*Id*.) and specifically stated in a footnote, "had the broker dealers been directly involved in the embezzlements … this would be a different case." *Id.* at 237 n. 6. The *Myatt* court, without independent analysis, appears to have simply applied the *in pari delicto* doctrine pursuant to *Knauer* because of the lack of a fraudulent conveyance claim in that case. However, in *Myatt*, as in *Knauer*, the court noted that there was no direct connection between the defendant bank and the unlawful conduct.

7

The case herein is precisely the type of case that the *Knauer* court distinguished. Here, the Receiver's claims against Kaplan are not merely passive, derivative, or related to the supervision of others. The claims herein are based on Kaplan's direct involvement with the scheme, including his bad legal advice, active assistance to the wrongdoers, and personal promotion of the scheme to potential investors.

Considering the important public policy interests at stake, the Court finds that the *in pari delicto* doctrine should not be applied to bar the Receiver herein from attempting to obtain recovery for the victims of the Zeek scheme from a person accused of directly participating in the illegal scheme. The only people who will be hurt by the application of *in pari delicto* to bar third party actions other than for fraudulent transfers are the victims of the RVG scheme. All the professionals, advisors and others who helped make the scheme possible with their own wrongful conduct will enjoy the windfall of avoiding liability for their misdeeds. Such a result in is simply not equitable.

**C. Malpractice claim**

In addition to arguing that *in pari delicto* should preclude any claims against him, Kaplan contends that the Receiver's legal malpractice claim should be dismissed because the Complaint fails to plead the elements of a plausible legal malpractice claim. Under North Carolina law, a claim for legal malpractice requires a showing: "(1) that the attorney breached the duties owed to his client . . . and that this negligence (2) proximately caused (3) damage to the plaintiff." *Rorrer v. Cooke*, 329 S.E.2d 355, 366 (N.C. 1985).

The Complaint alleges multiple instances of Kaplan's omission to use reasonable care and diligence in his representation of RVG, summing up these breaches as follows:

> Defendant's negligent acts and omissions, including generally promoting the scheme, failing to provide material facts (including tax information) during ZeekRewards promotional calls, and allowing his name to be used to prop up ZeekRewards as a supposedly legitimate enterprise, breached his duties to RVG.

(Compl. at ¶ 51). The Court finds that these allegations are sufficient to plausibly establish the first element of a legal malpractice claim.

Kaplan further argues that the Receiver has failed to plead that his actions proximately caused RVG's damages, because in order to do so, the Receiver must allege and prove that the loss would not have occurred *but for* Kaplan's conduct. In support of his argument, Kaplan cites *Belk v. Cheshire*, 583 S.E.2d 700, 704 (N.C. Ct. App. 2003). However, the standard set forth in *Belk* applies to criminal legal malpractice actions, not the current case. *See Dove v. Harvey*, 608 S.E.2d 798, 801 (N.C. Ct. App. 2005) ("In *Belk v. Cheshire*, 159 N.C.App. 325, 332, 583 S.E.2d 700, 706 (2003), this Court explained that in a *criminal legal malpractice action*, the plaintiff has a high burden of proof to show proximate causation.") (emphasis added). As the *Dove* opinion explains, "In *Belk*, this Court reviewed cases from other jurisdictions and determined several public policy reasons supported a stricter standard for criminal malpractice actions." *Id*. at 801–02.

Rather than the inapplicable "stricter standard" of *Belk,* the Receiver herein must prove proximate cause by merely showing that Kaplan's actions were "a substantial factor . . . of the particular injuries for which [the Receiver] seeks

recovery." *Self v. Yelton*, 688 S.E.2d 34, 38 (N.C. Ct. App. 2010) (quoting *Brown v. Neal*, 197 S.E.2d 505, 509 (N.C. 1973)). The Court finds that the Receiver has alleged sufficient facts to support the plausible conclusion that Kaplan's breaches proximately caused damages to RVG. As the Complaint sets forth, because of Kaplan's negligent omissions, "Affiliates were placated in their misguided belief that ZeekRewards was a lawful program," which prolonged the scheme and deepened its insolvency. (Compl. at ¶¶ 47, 48). Further, the Receiver alleges that:

> by allowing ZeekRewards to use his name in providing Affiliates the false perception that ZeekRewards was a lawful enterprise and by serving as a resource in answering Affiliates' tax questions via email, Kaplan assisted in prolonging the scheme, deepening RVG's insolvency and causing significantly more loss to RVG than it otherwise would have incurred.

(Id. at ¶ 48). These statements, taken as true, demonstrate that Kaplan's omissions were a substantial factor in the harm caused to RVG. The Receiver has pleaded sufficient allegations to support a showing that Kaplan's breaches of duty proximately caused damages to RVG.

### D. Aiding and Abetting Breach of Fiduciary Duty

Kaplan next argues that the Receiver's claim for aiding and abetting breach of fiduciary duty must be dismissed because North Carolina does not recognize such a cause of action. It appears that the Defendant is correct that North Carolina has never recognized this cause of action. *See Tong v. Dunn*, 2012 WL 944581 at *4 (N.C. Super. Ct., March 19, 2012); *Laws v. Priority Trustee Service of N.C., L.L.C.*, 610 F. Supp. 2d 528, 532 (W.D.N.C. 2009). The Receiver contends, however, that Nevada law applies to the Receiver's claim because RVG was incorporated in Nevada and the claim involves the "internal affairs" of RVG. "Under North Carolina law, the

substantive law of a corporation's state of incorporation governs suits involving '[the] corporation's internal affairs—*matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders....*'" *Haberland v. Bulkeley*, 896 F.Supp. 2d 410, 420 (E.D.N.C. 2012) (quoting *Bluebird Corp. v. Aubin*, 188 N.C.App. 671, 680–81 (2008)) (emphasis added). Mr. Kaplan is neither an officer, director, nor shareholder of RVG. Therefore, this claim does not invoke the internal affairs doctrine and Nevada law is inapplicable. As North Carolina does not recognize this claim, it must be dismissed.

### E. Constructive Trust

Finally, Kaplan moves to dismiss the Receiver's claim for constructive trust, arguing that "constructive trust" is merely a remedy under North Carolina law, not a cause of action. North Carolina law holds that a constructive trust may be requested as a claim or in the prayer for relief. *See*, *e.g.*, *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 723 S.E.2d 744 (N.C. 2012) (reversing denial of constructive trust for further fact-finding where constructive trust was alleged as an affirmative claim for relief); *see also Cury v. Mitchell*, 688 S.E.2d 825, 828 (N.C. Ct. App. 2010) ("These allegations and the facts as presented in the complaint are sufficient to state a claim for constructive trust, and the trial court erred by granting defendant's motion to dismiss for failure to state a claim."). The Court finds that the Receiver has properly requested a constructive trust, regardless of whether it is technically considered a claim or a remedy.

IT IS THEREFORE ORDERED that Defendant's Motion to Dismiss is hereby GRANTED IN PART AND DENIED IN PART, and Plaintiff's Second Claim for Relief is hereby dismissed.

Signed: February 29, 2016

Graham C. Mullen
United States District Judge